James B. Davidson (11985)
jbd@aterwynne.com
Lori Irish Bauman [*Pro Hac Vice* Admission to be Filed]
lib@aterwynne.com
Heidee Stoller [*Pro Hac Vice* Admission to be Filed]
hs@aterwynne.com
ATER WYNNE LLP
1331 NW Lovejoy Street, Suite 900
Portland, OR  97209-3280
Telephone:     (503) 226-1191
Facsimile:     (503) 226-0079

John P. Harrington (5242)
jharrington@hollandhart.com
Cecilia M. Romero (9570)
cmromero@hollandhart.com
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT  84101
Telephone:     (801) 799-5800
Facsimile:     (801) 799-5700

Attorneys for Plaintiff, Federal Deposit Insurance Corporation
        as Receiver for Centennial Bank

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CENTENNIAL BANK,<br><br>        Plaintiff,<br><br>vs.<br><br>CLINT E. WILLIAMS, SUZANNE GNEHM, LARRY E. GRANT, W. ALAN THOMSON, BRUCE H. JONES, R. SCOTT PRIEST, and NEIL J. WALL,<br><br>        Defendants. | **COMPLAINT**<br><br>Case No. 2:13-cv-00883<br><br>Magistrate Paul M. Warner<br><br><br>**JURY DEMAND** |

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Centennial Bank, Ogden, Utah ("FDIC-R"), for its Complaint against Defendants Clint E. Williams, Suzanne Gnehm, Larry E. Grant, W. Alan Thomson, Bruce H. Jones, R. Scott Priest, and Neil J. Wall, states as follows:

## INTRODUCTION

1.      The Federal Deposit Insurance Corporation ("FDIC") brings this lawsuit in its capacity as Receiver for Centennial Bank ("Centennial" or the "Bank"), pursuant to authority granted by 12 U.S.C. § 1821.

2.      Defendants are seven former directors and/or officers of Centennial who breached their duties to the Bank by approving high-risk acquisition and development ("A&D") loans and commercial real estate ("CRE") loans (collectively, the "Loan Transactions") in violation of the Bank's lending policies and prudent, safe, and sound lending practices.  The FDIC-R seeks to recover losses of at least $11.2 million caused by Defendants' gross negligence and breaches of fiduciary duties in approving 16 Loan Transactions.

3.      As Bank directors and/or officers and loan committee members who approved the Loan Transactions, Defendants had a duty to the Bank to ensure compliance with the Bank's Credit Policy and prudent, safe, and sound lending practices, and to make informed decisions in the best interests of the Bank.  Specifically, Defendants were required, among other things, to determine that the borrowers and any guarantors were creditworthy, there was a clear and viable source of repayment if the project did not proceed as planned, and the loans would not result in unwarranted risks to the Bank.

2

4.      Defendants wholly abdicated each of these responsibilities by repeatedly disregarding the Bank's Credit Policy and prudent, safe, and sound lending practices, including causing the Bank to loan millions of dollars to borrowers who had no adequate means to repay the loans if proposed projects failed or underperformed.

5.      Several of the Loan Transactions were "stated income" construction loans.  The Bank's stated income loans allowed a borrower to obtain a loan without providing any proof or verification of income.  Defendants approved various high-risk stated income loans even though the loan presentations departed from the Bank's Credit Policy and, on their face, raised serious doubts that the borrowers and guarantors were providing accurate information about their incomes.

6.      Each of the 16 Loan Transactions at issue in this action suffered from multiple deficiencies which together created the high risk of loss.  Defendants approved the 16 Loan Transactions despite such serious Credit Policy violations as flaws and inconsistencies in the loan presentations, insufficient and troubling financial documentation, and manifest loan underwriting deficiencies.  Defendants also failed to consider borrowers' and guarantors' obligations in connection with their other projects and other debts, failed to require that borrowers and guarantors have sufficient cash equity, and failed to ensure that the loans complied with the Bank's Credit Policy and prudent, safe, and sound lending practices.

7.      Defendants' actions and inactions were especially reckless in light of the Bank's high concentration in speculative CRE lending, including high-risk A&D loans, acquisition, development and construction ("ADC") loans, and stated income construction loans (collectively "CRE/ADC loans").  The Bank's exposure to the real estate market (resulting from its high

concentration in CRE/ADC loans, corresponding lack of diversification, and approval of numerous poorly underwritten CRE/ADC loans to uncreditworthy borrowers for projects in overvalued markets) warranted greater underwriting scrutiny, increased caution, strict adherence to loan policies, and other steps to minimize risk.  Instead of taking those steps, Defendants took the opposite tack.  Defendants forged ahead with imprudent loans ignoring the Bank's Credit Policy and jettisoning prudent, safe, and sound lending practices.

8.      Defendants were grossly negligent and breached their fiduciary duties to the Bank by, among other things, approving the Loan Transactions despite their failure to conduct the required analyses and take precautionary measures to minimize the Bank's increasing risk. Defendants are liable for the damages that the Bank suffered as described more fully herein.  In this lawsuit, the FDIC-R seeks to recover damages flowing from Defendants' gross negligence and breaches of fiduciary duties.

## **PARTIES**

9.      Plaintiff FDIC-R is Receiver of the Bank, with statutory rights and duties established by Congress pursuant to 12 U.S.C. § 1811, *et seq*.  On March 5, 2010, the Bank was closed by the Utah Department of Financial Institutions ("UDFI"), and the FDIC-R was appointed as Receiver pursuant to 12 U.S.C. § 1821(c).  At that time, the FDIC-R succeeded to all the rights, titles, and privileges of the Bank and its depositors, account holders, other creditors, and stockholders.  12 U.S.C. § 1821(d)(2)(A)(i).  The FDIC-R seeks recovery for the losses described herein, which have contributed to losses estimated at more than $88 million to the Deposit Insurance Fund.  The FDIC-R is subrogated to rights described above, including those of depositors and creditors, with respect to the Defendants' grossly negligent lending of

4

insured depositor funds and breaches of fiduciary duty.  Pursuant to 12 U.S.C. § 1821(d)(11)(A), any recoveries that the FDIC-R makes, after administrative expenses, are to be paid first to the insured depositors before other creditors.

10.     Defendant Clint Williams ("Williams") is the former President and a former director of the Bank.  Williams was President and a director of the Bank from about May 15, 2003 until the Bank failed on March 5, 2010, and was a member of the Bank's In-House Loan Committee ("IHLC") and Board Loan Committee ("BLC") from July 2003 to March 2010. Based on information and belief, Williams currently resides in Ogden, Utah.

11.     Defendant Suzanne Gnehm ("Gnehm") is a former officer of the Bank.  Gnehm was the Assistant Vice President of Lending Operations from 1998 until the Bank failed in March 2010.  Gnehm was also the Bank's Chief Underwriter and Risk Officer from about May 22, 2007 through about November 24, 2009.  She was a member of the IHLC and BLC from about October 2003 to March 2010.  Based on information and belief, Gnehm currently resides in Kaysville, Utah.

12.     Defendant Larry Grant ("Grant") is a former officer of the Bank.  Grant was a Senior Vice President ("SVP") from about August 4, 2003 to about August 4, 2004, a Commercial Loan Officer from about August 4, 2004 to about April 26, 2005, Executive Vice President of Commercial Loans & Leasing from about April 26, 2005 to about November 24, 2009, and Chief Credit Officer from about November 24, 2009 until the Bank failed in March 2010.  He was a member of the IHLC and BLC from about December 2003 to March 2010. Based on information and belief, Grant currently resides in Salt Lake City, Utah.

5

13.     Defendant W. Alan Thomson ("Thomson") is a former officer of the Bank. Thomson was the Southern Region Area Manager and SVP of Construction and Mortgage Lending from about August 1, 2003 until the Bank failed in March 2010.  He was a member of the IHLC and BLC from about July 2003 to March 2010.  Based on information and belief, Thomson currently resides in Provo, Utah.

14.     Defendant Bruce Jones ("Jones") was a director of the Bank from about December 11, 1996 until the Bank failed in March 2010, and was a member of the BLC from no later than June 2006 to March 2010.  Based on information and belief, Jones currently resides in Pleasant View, Utah.

15.     Defendant Scott Priest ("Priest") was a director of the Bank from about December 11, 1996 and Chairman of the Board from about June 2007 until the Bank failed in March 2010.  He was a member of the BLC from no later than June 2006 to March 2010.  Based on information and belief, Priest currently resides in Layton, Utah.

16.     Defendant Neil Wall ("Wall") was a director of the Bank from about August 24, 2004 until the Bank failed in March 2010, and was a member of the BLC from about October 2004 to March 2010.  Based on information and belief, Wall currently resides in Layton, Utah.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 *et seq.*, 12 U.S.C. § 1819(b)(1) and (2) and 28 U.S.C. §§ 1331 and 1345.  The FDIC-R is an instrumentality organized and existing under the laws of the United States of America. Actions to which the FDIC-R is a party are deemed to arise under the laws of the United States. The FDIC-R is authorized to sue and complain in any court of law and is empowered to

prosecute claims held by the Bank, including its claims against Defendants in this action.  12 U.S.C. §§ 1819, 1821(k).

18.      This Court has personal jurisdiction over Defendants, who, upon information and belief, reside in Utah and at all relevant times conducted business and committed the alleged acts and omissions in the State of Utah.

19.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events, acts and omissions giving rise to the FDIC-R's claims occurred in this district and Defendants reside in this district.

## FACTUAL BACKGROUND

20.      Centennial was established on April 2, 1997, as a state nonmember bank in Ogden, Utah, supervised by the FDIC and the UDFI.  Centennial aggressively made CRE/ADC loans despite an already extremely high concentration in CRE/ADC loans, a corresponding lack of diversification, poor underwriting practices, and regulatory warnings about the risks of CRE/ADC lending.

### Excessive Concentration in Speculative CRE/ADC Lending

21.      In 2006 and 2007, CRE loans made up 90 percent of Centennial's loan portfolio and 800 percent of its Tier 1 Capital.  Centennial's concentration of CRE loans was in the 98th to 99th percentile compared to its peer banks.  The majority of the Bank's CRE loans was in risky A&D, ADC, and stated income construction loans.

22.      CRE lending is speculative because of, among other reasons, the lack of present cash flow sources, uncertainties in the development and sale of real estate, and the need for adequate secondary sources of repayment.  These risks are even greater when the CRE lending

consists of speculative A&D and ADC loans for real estate projects being constructed in anticipation of projected future demand.  Compounding the Bank's risk was the lack of any binding commitments by buyers to purchase the properties upon completion of construction. Prudent lending in this high-risk segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry, and strict adherence to prudent lending policies and standards.

23.     "Stated income" construction loans were another risky category of CRE loans made by the Bank.  Stated income loans allow a borrower to obtain a loan without providing a bank with any verification of income.  Beginning as early as 2005, the Bank was experiencing losses from borrowers who had obtained construction loans purportedly to construct their primary residences when, in reality, they had no intention of residing in the homes, but instead planned to "flip" the homes for profit by selling them when they were built ("spec borrowers"). Although the Bank classified a stated income construction loan as a loan for a home presold to a buyer planning to live in the home, it was actually a high-risk loan to a real estate speculator. Such loans often were brokered loans assembled by mortgage brokers who brought the Bank a large volume of loan applications from spec borrowers.  Defendants knew or were grossly negligent for not knowing about the escalating problems the Bank was experiencing in and after 2005 due to brokered loans and defaults on stated income construction loans to spec borrowers.

24.     Stated income loans made it easier for spec borrowers to obtain loans by submitting false, misleading or incomplete statements of income.  Despite having knowledge of losses attributable to brokered loans to spec borrowers, the Bank failed to take appropriate measures to avoid losses from making additional stated income loans.  By October 2007, stated

8

income loans constituted 60 percent of the Bank's residential construction loans and approximately 25 percent of the Bank's total loans.

25.     Centennial's excessive concentration of CRE/ADC lending, including its high volume of stated income construction loans and loans to spec borrowers, increased the Bank's risk for numerous reasons, including the following:  concentration in any particular sector of the economy increases risk resulting from that sector's downturn; the housing market is cyclical by nature; the primary source of loan repayment is cash flow from the sale of the real estate collateral, which may lose value or not sell in a downturn of the market cycle; and, historically, bank failure rates closely correlate with high CRE/ADC concentrations.  Concentrations of CRE/ADC loans in volatile commercial real estate markets render a bank vulnerable to changes in market conditions and require vigilant adherence to the Bank's Credit Policy and prudent, safe, and sound lending practices.  It is necessary that the known risks inherent in these high risk loan concentrations be managed carefully by, among other things, greater underwriting scrutiny, risk assessment, monitoring of all CRE/ADC loans, portfolio risk management, and market analysis.  As demonstrated more fully below, Defendants breached their duties to the Bank by failing to heed warnings from regulators and others about the risks they created and failing to manage such risks appropriately in approving CRE/ADC loans.

**Defendants Recognized the Risks from the Bank's Lending Practices**

26.     Defendants knew, or were grossly negligent for not knowing, the risks to the Bank from their CRE lending activities, including, among other risks, the "inevitable downturn" after the "housing boom."  The Bank's July 2005 Quarterly Update of its Risk Management Policy ("RMP") stated that the Bank was "very dependent on the housing boom," and that, "in

the inevitable downturn, credit quality could deteriorate to the extent that the bank could experience significant losses."  Centennial's October 2005 RMP Quarterly Update expressly warned that "evidence of a slowdown is plentiful."  The Bank's October 2006 RMP Quarterly Update warned that the "slowing of the housing market" had been "long-anticipated."

27.     The October 2006 RMP Quarterly Update also cautioned that "the greatest risk to our bank is in the riskier segments:  loans for land acquisition and for speculative development and construction.  Historically, these are the first to register the effects of a slowdown both in terms of slowing demand for new loans and weakening quality of existing loans."

28.     Defendants also knew the risks associated with brokered loans to spec borrowers. In March 2006, Defendant Williams informed regulators, and the other Defendants knew he did so, that the greatest risk to the Bank was from fraudulent brokered loans to spec borrowers, where mortgage brokers present construction loans from borrowers, indicate the loan is pre-approved, and falsely represent that the borrower intends to occupy the residence.  Under such circumstances, Defendant Williams warned, a given "straw" borrower could have loans at a number of different institutions stating the same thing.

**The Regulators Warned That the Bank's Lending Practices Necessitated Increased Underwriting Scrutiny and Risk Management Procedures**

29.     Regulatory agencies periodically reminded financial institutions of the risks involved in CRE/ADC lending and the need for heightened risk management practices when concentrations of CRE/ADC lending existed.  On October 8, 1998, the FDIC issued Financial Institution Letter 110 98 ("FIL-110-98"), which warned financial institutions of the risk inherent in ADC lending in a favorable real estate market, including an over-supply of developed property.  Among other things, FIL-110-98 stated, "ADC lending is a highly specialized field

with inherent risks that must be managed and controlled to ensure that this activity remains profitable."

30.     In June 2006, warning about losses from spec borrowers, regulators expressed concerns because Centennial's adverse classifications had increased 303 percent and that the increase was mainly the result of loans identified as suspected "straw" borrower loans.  Adverse classifications are assets that are considered by bank examiners to be of substandard credit quality, whose full repayment of principal and accrued interest is questionable.

31.     In September 2006, regulators again warned the Bank about the risks of its heavy concentration of CRE loans in excess of 300 percent of Tier 1 Capital, a threshold regulators typically use as a guideline to establish where rigorous risk management practices are essential. Regulators urged Centennial to follow regulatory guidance and best practices regarding CRE.

32.     On December 12, 2006, the Office of the Comptroller of the Currency, the FDIC, and Board of Governors of the Federal Reserve System jointly issued "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices."  FIL-104-2006, *Guidance on Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices*, 71 Fed. Reg. at 74581, 74585 (Dec. 12, 2006).  This joint guidance specifically warned of the substantial risks posed by concentrations in CRE loans because of the cyclical and volatile nature of real estate markets and warned that "concentrations in CRE lending coupled with weak underwriting and depressed CRE markets have contributed to significant credit losses in the past."

6433245_1

**The Bank's Credit Policy**

33.     Throughout the period relevant to the FDIC-R's claims, the Bank's Credit Policy provided guidelines and requirements for underwriting, recommending the approval of loans, and approving loans.  These Credit Policy guidelines and requirements reflected the Bank's collective business judgment regarding proper lending standards and were put in place to protect against risks, including the risks created by the Bank's aggressive CRE/ADC lending. Defendants owed a duty to the Bank to comply with the Bank's Credit Policy in making lending decisions.

34.     Specifically, the Bank's Credit Policy required Defendants "[t]o grant all loans on a sound and collectible basis, meeting established documentation standards."  The creditworthiness of borrowers was to be "determined by established credit history, length of employment, length of residence, and the ability to repay the loan."  Among other things, the Credit Policy established loan documentation requirements, underwriting standards, loan-to-value ("LTV") ratios, characteristics of desirable and undesirable loans, and appraisal requirements.  The Credit Policy also established specific criteria for different types of loans.

A.     <u>A&D Loans</u>:  The Credit Policy required Defendants to consider "[a] developer's net worth and current income, as reflected in financial statements," to review the developer's other projects to determine whether the borrower was overextended, and to require a minimum percentage of cash equity.

B.     <u>Construction Loans</u>:  The Credit Policy prohibited sole reliance on the representation that there was a buyer committed to a long-term loan to

purchase the home after it was constructed.  The Credit Policy stressed that it would be "most imprudent" to rely on a commitment from another financial institution to provide future take-out financing as the sole recovery source for construction loans.  Instead, the Credit Policy required that "the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

C.     <u>Stated Income Construction Loans</u>:  For stated income construction loans, the Credit Policy required that a determination be made as to whether the stated income was reasonable for the borrower's type of position and experience, and the geographical area.  An applicant had to provide verification of income if the applicant's stated income was out of line with the average income for that occupation and geographical area.

**Loan Approval Committees and Limits**

35.     Under the Bank's Credit Policy, loans in excess of $500,000 required approval of the IHLC, which included Defendants Williams, Gnehm, Grant, and Thomson.  Before May 2007, loans in excess of $800,000 required BLC approval, and after May 2007, the BLC approval threshold was $1.2 million.  At times, all of the Defendants were members of the BLC.

36.     In reality, the IHLC and BLC functioned as a single committee.  When a loan exceeded the approval authority of the IHLC, one outside director who was a member of the BLC had to participate in making loan approval decisions with the IHLC members.

6433245_1

37.     For each loan considered at a committee meeting, the IHLC and BLC members received a loan presentation prepared by a loan officer.  Supporting documentation, including borrowers' and guarantors' financial information, was available for IHLC and BLC members to review.  Contrary to the Bank's Credit Policy, the BLC and IHLC repeatedly approved loans based upon substandard loan presentations and financial information that revealed deficient underwriting and reasons not to approve the loans.

**Defendants' Grossly Negligent Acts and Breaches of Fiduciary Duties**

38.     As officers and/or directors of the Bank and members of the IHLC and/or BLC, Defendants were obligated to follow the Bank's Credit Policy and prudent, safe, and sound lending practices in approving loans.  Defendants were fully aware that the Bank was engaged in a highly risky lending strategy and because of its excessive concentration of CRE/ADC loans, they had a duty to conduct increased scrutiny of the loans presented to them for possible approval.

39.     Between August 2006 and February 2008, Defendants breached their duties to the Bank by approving and causing the Bank to fund loans that would not have been made had Defendants complied with the Bank's Credit Policy and followed prudent, safe, and sound lending practices.

40.     Defendants' gross negligence and breaches of fiduciary duty in recommending and approving loans included, among other things:

A.      Failing to ensure appropriate analyses of borrower and guarantor financial conditions, resources, and responsibilities as required by the Credit Policy,

such as not fully appreciating or taking into account deficient borrower and guarantor liquidity, income, or project equity;

B.      Relying on outdated and unverified financial information from borrowers and guarantors;

C.      Failing to require appropriate analyses of the sources of repayment;

D.      Failing to require cash equity as required by the Credit Policy and failing to ensure that the cash equity was not borrowed;

E.      Relying excessively on take-out loans, which could fail to materialize for a variety of reasons, as repayment for construction loans in violation of the Credit Policy;

F.      Failing to require that representations made by borrowers in connection with stated income construction loans were investigated appropriately, such as in circumstances where loan presentations contained implausible income information or omitted required information regarding a borrower's alleged occupation and income;

G.      Failing to require that loans approved by the committee fully conformed with the Bank's Credit Policy and that the committee fully documented the reasons for any departure from the Bank's Credit Policy deemed to be acceptable under the circumstances; and

H.      Failing to approve only loans that conformed with prudent, safe, and sound lending practices.

15

41.     In January 2008, regulators informed Centennial that its adversely classified assets had greatly increased as the result of the Bank's high concentration in residential construction loans, an interruption in the secondary mortgage market, relaxed underwriting standards, and spec borrowers misrepresenting intentions regarding owner occupancy.  The regulators also admonished the Bank management's decision to originate a significant dollar amount of stated income residential construction loans without setting a formal limit on such credit which had greatly contributed to the current less than satisfactory condition of the institution.

42.     But for Defendants' gross negligence and breach of their duties to Centennial, the Bank would not have funded the Loan Transactions whose approval caused the Bank to suffer over $11.2 million in damages.  The following table lists the 16 Loan Transactions and identifies the officers and directors who voted to approve each Loan Transaction.  The actual names of the borrowers and guarantors are not given due to privacy concerns, but have been disclosed to Defendants.

| The 16 Loan Transactions | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Approvals | | | | | | | |
| Borrower | Approx. Approval Date | Amount ($millions) | Damages ($millions) | Williams | Gnehm | Grant | Thomson | Jones | Priest | Wall |
| 1.   Borrower A | Aug. 31, 2006 | $0.752 | $0.353 | x | | x | x | x | | |
| 2.   Borrower B | Sep. 27, 2006 | $2.240 | $0.852 | x | | x | x | | x | |
| 3.   Borrower C | Nov. 9, 2006 | $2.500 | $0.943 | x | | x | x | x | | |
| 4.   Borrower D | Dec. 6, 2006 | $0.672 | $0.213 | x | x | x | | | | |
| 5.   Borrower E | Dec. 20, 2006 | $2.470 | $0.726 | x | | x | x | | x | |
| 6.   Borrower F | Jan. 18, 2007 | $1.200 | $0.361 | x | | x | x | | | x |
| 7.   Borrower G | Feb. 15, 2007 | $0.940 | $0.390 | x | | x | x | x | | |

| The 16 Loan Transactions | | | | Approvals | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Approx. Approval Date | Amount ($millions) | Damages ($millions) | Williams | Gnehm | Grant | Thomson | Jones | Priest | Wall |
| 8.   Borrower H | Feb. 22, 2007 | $0.935 | $0.456 | x | | x | x | | | x |
| 9.   Borrower I | Mar. 22, 2007 | $2.750 | $1.644 | | | x | x | x | | |
| 10. Borrower J | May 7, 2007 | $0.935 | $0.342 | x | | x | | | | |
| 11. Borrowers K & L | May 17, 2007 | $0.600 | $0.310 | x | x | | | | | |
| 12. Borrower M | June 7, 2007 | $1.350 | $1.095 | x | | x | x | | | x |
| 13. Borrowers N & O | July 6, 2007 | $1.031 | $0.689 | | x | x | x | | | |
| 14. Borrower P | Aug. 2, 2007 | $0.920 | $0.632 | | | x | x | | | |
| 15. Borrower Q | Aug. 23, 2007 | $3.000 | $1.577 | x | | x | x | x | | |
| 16. Borrower R | Feb. 8, 2008 | $2.057 | $0.653 | x | | | x | | x | |
| TOTAL | | $24.352 | $11.236 | | | | | | | |

43.     For all of the Loan Transactions, the deficient underwriting, inadequate information, and lack of appropriate credit analyses were facially apparent from the loan presentations and supporting materials provided to the IHLC and BLC.  Defendants knew from the loan presentations, or had Defendants insisted on the required underwriting and credit analyses, would have known, among other things, that, for various Loan Transactions, there were no adequate sources of repayment, the borrowers' and guarantors' creditworthiness did not support the loan amounts, there was insufficient equity in some of the projects, and the Loan Transactions should not have been approved.

44.     Damages caused by the gross negligence and breaches of fiduciary duties of Defendants in approving the Loan Transactions prevented the Bank from, among other things, meeting its obligations to depositors and creditors by diminishing the Bank's capital, forgoing sound investment opportunities, and causing other harm.

**Borrower A**

45.     On or about August 31, 2006, the BLC, including Williams, Grant, Thomson, and Jones, approved a $752,000 construction loan to Borrower A and accepted the personal guarantee of Borrower A's owner.  The loan was requested for the purchase of a lot and the construction of a new residence for a buyer who purportedly agreed to purchase the house as a primary residence after it was constructed.  Borrower A was also the builder of the home.

46.     Prior to approving this Loan Transaction, Defendants who approved the Loan Transaction ("Approving Defendants") had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower A loan.

47.     The loan presentation provided that the primary and secondary repayment sources were to be, in order, a long-term mortgage and "monthly payments."  Although the loan presentation described proceeds from permanent financing as the primary repayment source, the loan presentation was devoid of any evaluation of refinancing prospects, challenges, or other relevant information needed to comply with the requirements of the Bank's Credit Policy.  Approving Defendants had no information upon which to judge the availability of third-party financing, aside from a mortgage company's non-binding commitment.  As noted, the Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  This is because "[t]he take-out commitment can be lost for a number of reasons, and neither the borrower nor the bank has control if the permanent lender should decide not to honor its commitment."  The Credit Policy therefore required that "the real estate and the project

18

must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

48.     Although the loan presentation listed the secondary repayment source as "monthly payments," the borrower and guarantor did not have the means to repay the loan.  The loan presentation relied solely on the 2005 income of the borrower and guarantor, and did not include information about the borrower's 2006 year-to-date income.  Had Approving Defendants required information about the borrower's year-to-date income as the Credit Policy contemplated, a cursory review of the borrower's most current financial statement would have shown that, as of August 2006, Borrower A's year-to-date net income was only approximately $1,200.  Borrower A also had minimal liquid assets and a modest net worth.  Similarly, it was clear that the guarantor, whose income was based primarily on the financial condition of Borrower A, could not repay the loan.  Furthermore, although the loan presentation advised that Borrower A was involved in numerous other construction projects, it did not identify the debt service requirements of Borrower A and the guarantor in connection with those other projects. In violation of the Bank's Credit Policy, Approving Defendants failed to insist that this required information be included in the loan presentation.

49.     The purported purchaser of the house failed to obtain a long-term mortgage and purchase the house and Borrower A defaulted on the loan after March 6, 2007.  By this time, Borrower A's income and net worth were negative.  The sale of the house and the assets of the borrower and guarantor were insufficient to repay the loan.

50.     As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Jones in approving the Borrower A loan, Centennial incurred damages in excess of $353,000.

### Borrower B

51.     On or about September 27, 2006, the BLC, including Williams, Grant, Thomson, and Priest, approved a $9,577,500 acquisition and development loan to Borrower B, and accepted the personal guarantees of Borrower B's owners.  Bankers Bank of Atlanta participated in the loan by advancing the amount of $7,337,244 to Borrower B, and Centennial retained the remaining $2,240,256 of the loan.  The loan was requested for the purchase of land and development of a 92-lot residential subdivision.

52.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower B loan.

53.     Approving Defendants failed to give appropriate attention to Borrower B's or the guarantors' ability to service the debt on this large, high-risk land development loan. Borrower B claimed to have a net worth of $1,726,641 and net income of $735,921, which were insufficient to repay this $9,577,500 loan if the lots failed to sell.  Although Borrower B predicted that it would close on 160 homes in 2006, this was a facially unrealistic prediction given that Approving Defendants approved this loan when only three months remained in 2006. Although Borrower B claimed to have assets worth over $18 million, it also disclosed that it had over $17 million in liabilities.  Approving Defendants also failed to consider Borrower B's debt

service requirements for its other projects in violation of the Credit Policy, which required a review of the borrower's other projects to determine whether the borrower was overextended. No such review was performed.

54.     As to the guarantors, the loan presentation showed that the guarantors had a year-to-date net income of only $54,000 each.  Although the guarantors claimed to have a net worth of over $2,000,000 each, a significant portion of their claimed net worth was ownership interest in Borrower B.  The guarantors had minimal liquid assets, and it was clear from the presentation that if the lots failed to sell, the borrower and guarantors could not repay this $9,577,500 loan.

55.     In addition, Approving Defendants violated the Bank's Credit Policy by approving the loan despite evidence that the borrower had insufficient equity in the project.  The borrower committed approximately $650,000 in cash equity, or just over 6.5 percent of the loan.  However, the Credit Policy required 10 percent cash equity from borrowers of land development loans, providing that, "The amount of cash equity a developer or borrower invests in a project is an important indication of borrower commitment and capacity.  It is also an important predictor of the borrower's inclination to stay with a project after problems arise."  Furthermore, Approving Defendants ignored the source of the funds for the cash equity.  Borrower B's June 2006 financial statement showed only approximately $43,000 in liquid assets, but its September 2006 financial statement showed approximately $1.5 million in liquid assets.  Approving Defendants failed to require verification of the source of the suddenly appearing additional $1.5 million and to rule out the possibility that the additional assets came from borrowed funds.

56.     The lots failed to sell, and Borrower B defaulted on the loan after March 6, 2007.

The value of the lots and the assets of the borrower and guarantors were insufficient to repay the

loan.

57.     As a result of the grossly negligent actions and inactions of Defendants Williams,

Grant, Thomson, and Priest in approving the Borrower B loan, Centennial incurred damages in

excess of $852,000.

## Borrower C

58.     On or about November 9, 2006, the BLC, including Williams, Grant, Thomson,

and Jones, approved a $3,952,500 A&D loan to Borrower C, and accepted the personal guarantee

of Borrower C's owner.  Bankers Bank of Atlanta purchased a participation in the amount of

$1,452,500, and Centennial retained $2,500,000 of the loan.  The loan was requested for the

development of an 82-lot residential subdivision.

59.     Prior to approving this Loan Transaction, the Approving Defendants had been

warned about the need for increased underwriting scrutiny due to the Bank's high concentration

in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and

reasonably available information related to the Borrower C loan.

60.     The loan presentation provided that the primary repayment source was "sale of

lots," and the secondary repayment source was "term loan/liquidation of personal assets."  The

loan presentation expressly warned that the "slowing in the economy, slowing the sale of lots"

was a significant risk factor for this loan.

61.     Although the loan presentation listed the secondary repayment source as "term

loan/liquidation of personal assets," it made clear that the borrower and guarantor would be

22

unable to repay the loan if the lots failed to sell.  Borrower C was a single purpose LLC created for the development project and had no meaningful financial information available.  The loan presentation listed the guarantor's 2005 income as just $58,126 and did not report his year-to-date 2006 income.  Furthermore, the loan presentation showed an increase in the guarantor's net worth from $1,200,000 in 2005 to over $10,000,000 in 2006, with no explanation whatsoever for the significant increase.  Had Approving Defendants required that explanation, as they should have under the Credit Policy, they would have learned that (a) almost all of the guarantor's net worth was in other real estate projects, subject to the slowdown in the market, (b) there was no verification that his assets were properly valued, and (c) there was no detailed information about his potential liabilities related to his other projects or other companies.  The borrower and guarantor could not repay this $3,952,500 loan.

62.     The lots failed to sell, and Borrower C defaulted on the loan after March 6, 2007. The value of the lots and the assets of the borrower and guarantor were insufficient to repay the loan after March 6, 2007.

63.     As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Jones in approving the Borrower C loan, Centennial incurred damages in excess of $943,000.

## Borrower D

64.     On or about December 6, 2006, the IHLC, including Williams, Gnehm, and Grant, approved a $672,000 brokered stated income construction loan to Borrower D.  The loan was requested for the purchase of a lot and the construction of a new residence for the borrower, who claimed that the house would be her primary residence.

65.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants also received warnings that brokered loans, such as the loan to Borrower D, represented a significant known risk to the Bank because of the known prevalence of mortgage fraud in connection with brokered loans.

66.     Although the borrower provided a non-binding commitment from a lender for a long-term mortgage for the home once the construction was finished, the Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required that "the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."  Approving Defendants failed to comply with this requirement.

67.     The loan presentation information about Borrower D's income, employment, and credit history suggested that the borrower misrepresented her "stated income."  Borrower D claimed to be the president of a window company in Utah.  She claimed that she made a salary of $240,000 per year.  In violation of the Credit Policy, there was no information in the loan presentation about whether the stated income was reasonable given the market and the borrower's line of work.  The Credit Policy also required evaluation of "the applicant's time on a specific job or length of time in a particular field" and a review of "available sources to compare 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."  The required diligence and analysis were especially important because, as Approving Defendants knew from the loan presentation, Borrower D had a credit score of only

24

662, had declared bankruptcy in 1999, and had several judgments and delinquent accounts from that time period.

68.     In August 2008, a new loan presentation for a proposed loan modification stated that Borrower D could not get a long-term mortgage because she did not file tax returns in 2006 and 2007.  In connection with the proposed modification, Borrower D stated that she had been self-employed at a company for four years, despite her claim to be the president of a different company less than two years before when she applied to the Bank for her stated income loan.

69.     The borrower failed to obtain a long-term mortgage and defaulted on the loan after March 6, 2007.  The sale of the house and the assets of the borrower were insufficient to repay the loan.

70.     As a result of the grossly negligent actions and inactions of Defendants Williams, Gnehm, and Grant in approving the Borrower D loan, Centennial incurred damages in excess of $213,000.

**Borrower E**

71.     On or about December 20, 2006, the BLC, including Williams, Grant, Thomson, and Priest, approved a $2,500,000 line of credit ("LOC") for Borrower E, and accepted the personal guarantees of Borrower E's owners.  The LOC was requested for the construction of single-family residences.  Borrower E was also the builder of the homes.

72.     The loan application requested that the LOC be part of Centennial's Premier Guidance Line 100 Program, which enabled certain preferred builders to obtain loans on favorable terms.  Under this LOC, Borrower E received five separate construction loans for

residences ostensibly pre-sold to buyers who would occupy the homes. The total amount distributed to Borrower E under the LOC was $2,470,000.

73.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans. Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower E LOC.

74.     Approving Defendants failed to ensure that the required review of financial information was conducted for this loan. Except for the section with FICO scores (which are credit rating scores), every section of the credit request presentation that Approving Defendants signed was blank.

75.     The supporting documentation was also insufficient to comply with the Credit Policy for approval of the LOC. Under the Bank's Credit Policy, approval of an LOC under the Premier Guidance Line 100 Program required two years of accountant-prepared financial statements for the borrower, verification and full disclosure of all present projects and related debt, both direct and contingent, and a breakdown of the debt servicing obligations of all principals and related entities. The financial statements provided by the borrower were not prepared by an accountant in violation of the Credit Policy. Furthermore, the financial statements showed minimal liquid assets. In addition, there was no verification of the value of the real estate listed as the borrower's primary asset. The loan was approved despite these omissions even though one guarantor had a low credit score of 633.

76.     Had the Approving Defendants further inquired, which they should have done under the Credit Policy given the obvious lack of financial information in the loan presentation,

they would have known that the loan file disclosed that Borrower E was responsible for 82 other projects involving debt of over $18 million, but contained nothing about the debt servicing requirements related to the pre-existing debt.  This also violated Centennial's Credit Policy, which required review of the borrower's debt servicing requirements in connection with other projects to determine whether the borrower was overextended.

77.     At the time Approving Defendants approved the LOC, there was no information about those who were to purchase the homes to be built with LOC funds.  Regardless, any reliance by Approving Defendants on lender commitments for long-term loans to individuals who claimed they were purchasing the homes as residences violated the Bank's Credit Policy, which warned that it would be "most imprudent" to rely on a commitment to provide future take-out financing as the sole recovery source for construction loans, and that, "This means, of course, that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

78.     Approving Defendants also failed to identify or address risks presented by the potential conflict of interest from Borrower E's ownership and Borrower E's use of its own in-house mortgage company.  This omission was costly with respect to the Borrower E LOC.  Before Approving Defendants approved the Borrower E LOC, Centennial had modified its Credit Policy to prohibit brokered loans for the Premier 100 line:  "Loans must be directly received from the builder, no brokered loans."  Contrary to the Credit Policy, all five of the take-out loan commitments in connection with this LOC were brokered through Borrower E's in-house mortgage company.

79.     The Approving Defendants approved this $2,500,000 LOC in violation of the
Bank's Credit Policy prohibiting brokered loans for Premier 100 lines of credit and in complete
disregard of the December 2005 warning by Defendant Williams that the "greatest risk" to the
Bank was from brokers submitting fraudulent applications for construction loans from buyers
who lied about their intent to purchase and live in houses after they were constructed.

80.     Later, Centennial learned that Borrower E's in-house mortgage company had
submitted fraudulent loan applications of the very kind Defendant Williams warned about in
December 2005.  Borrower E declared bankruptcy, and several family members of the
guarantors pled guilty to criminal charges based upon mortgage fraud.  One of these guarantor
family members was purportedly the buyer of a home constructed with funds from one of the
five loans under the Borrower E LOC.  Another purported buyer of a home constructed with
funds from the Borrower E LOC provided false employment information and concealed that he
was an employee of Borrower E.

81.     By having a captive mortgage company in-house, Borrower E was well-
positioned to provide fraudulent commitments for long-term financing for Borrower E
employees, friends and family so the builder could obtain loans for speculative investments.  The
Centennial Credit Policy prohibition of brokered loans in connection with its Premier Guidance
Line program was an important safeguard aimed at curbing such abuses.  Circumventing the
Bank's Credit Policy on this point was reckless and imprudent.

82.     All purported buyers in connection with the five construction loans financed with
the Borrower E LOC failed to obtain long-term mortgages and failed to purchase the houses, and

6433245_1

Borrower E defaulted on the LOC and declared bankruptcy after March 6, 2007. The sale of the houses and the assets of the borrower and guarantors were insufficient to repay the LOC.

83.     As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Priest in approving the Borrower E LOC, Centennial incurred damages in excess of $726,000.

**Borrower F**

84.     On or about January 18, 2007, the BLC, including Williams, Grant, Thomson, and Wall, approved a $1,200,000 A&D loan to Borrower F, and accepted the personal guarantee of Borrower F's owner. The loan was requested for the purchase of land and development of nine residential lots.

85.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans. Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower F loan.

86.     The loan presentation contains a critical error. The presentation showed that Borrower F had a 2004 net income of $1,607,072, a 2005 net income of $994,166, and 2006 net income of $1,405,020. It also showed that the owner of Borrower F had a low FICO score of 613 and 2006 net income of $118,030. Under the Credit Policy, these anomalous financial entries should have caused Approving Defendants to scrutinize the company's and guarantor's financial information more closely. Had Approving Defendants required an appropriate examination of the financial information, they would have known there was a glaring error in the loan presentation. The net income numbers in the loan presentation were actually Borrower F's

gross sales listed on its tax returns; in addition, the net income on its tax returns was $4,139 for 2005 and negative $129,539 for 2004.  Approving Defendants, without ensuring that the necessary diligence was performed, recklessly approved this loan based on the company's gross sales, rather than net profit.  Approving a loan to a real estate developer who, one year earlier, had almost no income and had lost $129,539 was a violation of the Credit Policy, which required consideration of developers' income before approving development loans.

87.     Further, if Approving Defendants had pursued the discrepancies in the loan presentation, Approving Defendants would have learned that, in addition to nonexistent income, the borrower's and guarantor's net worth were facially questionable.  The borrower's net worth was based on illiquid assets.  Nothing in the loan file verified the value of its assets.  The guarantor's net worth was based on a valuation of Borrower F at $2,500,000, which was obviously suspect because Borrower F had failed to generate any income over a two-year period. Moreover, the guarantor's financial statement showed that the guarantor had another mortgage and two outstanding construction loans when Approving Defendants approved this loan.

88.     The lots failed to sell, and Borrower F defaulted on the loan after March 6, 2007. The value of the lots and the assets of the borrower and guarantor were insufficient to repay the loan.

89.     As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Wall in approving the Borrower F loan, Centennial incurred damages in excess of $361,000.

**Borrower G**

90.    On or about February 15, 2007, the BLC, including Williams, Grant, Thomson, and Jones, approved a $940,000 brokered stated income construction loan to Borrower G.  The loan was requested for the purchase of a lot and the construction of a new residence for the borrower, who claimed that the house was going to be his primary residence.

91.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants had also received warnings that brokered loans, such as the loan to Borrower G, represented a significant known risk to the Bank because of the prevalence of mortgage fraud in connection with brokered loans.

92.    The borrower provided a non-binding commitment from a lender for a long-term mortgage to purchase the house after construction was complete.  However, the Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required "that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

93.    The loan presentation information about Borrower G's income and employment was suspicious and suggested that he misrepresented  his "stated income."  Borrower G claimed to be the vice president of operations at an upholstery products company in Utah.  He claimed to make a salary of $276,000 per year, even though he had only worked there for two months and had been employed in the industry for only four years.  The loan presentation omitted information on the borrower's age, 33 at the time, which would have raised additional suspicions

31

about his stated income.  The loan presentation also contained no analysis of whether the borrower's stated income was reasonable—all in violation of the Credit Policy, which required evaluation of "the applicant's time on a specific job or length of time in a particular field" and review of "available sources to compare 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."

94.     The borrower failed to obtain a long-term mortgage and defaulted on the loan after March 6, 2007.  The sale of the house and the assets of the borrower were insufficient to repay the loan.

95.     As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Jones in approving the Borrower G loan, Centennial incurred damages in excess of $390,000.

### Borrower H

96.     On or about February 22, 2007, the BLC, including Williams, Grant, Thomson, and Wall, approved a $935,000 brokered stated income construction loan to Borrower H.  The loan was requested for the purchase of a lot and the construction of a new residence for the borrower, who claimed that the house was going to be his primary residence.

97.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants had also received warnings that brokered loans, such as the loan to Borrower H, represented a significant known risk to the Bank because of the prevalence of mortgage fraud in connection with brokered loans.

98.     The borrower provided a non-binding commitment from a lender for a long-term mortgage to purchase the house after construction was complete.  However, the Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required "that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

99.     The loan presentation information about Borrower H's income and employment suggested that he misrepresented his "stated income."  Borrower H claimed to be a real estate investor who made $324,000 per year.  The loan presentation contained no analysis of whether this income was reasonable, in violation of the Credit Policy, which required evaluation of, "the applicant's time on a specific job or length of time in a particular field" and review of "available sources to compare 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."

100.    The borrower failed to obtain a long-term mortgage and defaulted on the loan after March 6, 2007.  The sale of the house and the assets of the borrower were insufficient to repay the loan.

101.    As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Wall in approving the Borrower H loan, Centennial incurred damages in excess of $456,000.

**Borrower I**

102.    On or about March 22, 2007, the BLC, including Grant, Thomson, and Jones, approved a $2,750,000 construction loan to Borrower I, and accepted the personal guarantee of

33

Borrower I's owner.  Bankers Bank of the West purchased a $204,600 participation in the loan, and Centennial retained $2,545,400.  The loan was requested for the purchase of a lot and the construction of a new primary residence for the guarantor, who was the owner of Borrower I.  Borrower I was also the builder of the home.

103.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's extremely high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower I loan.

104.    To the extent that Approving Defendants relied on a commitment for a long-term mortgage as a repayment source, the Bank's Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required "that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

105.    Approving Defendants failed to consider the borrower's and guarantor's lack of sufficient creditworthiness and inability to support the loan, including, among other things, their limited liquidity, limited income, and high leverage.  The loan presentation provided the borrower's and guarantor's year-to-date income, but the required entries for income information for the prior three years were blank.  Had Approving Defendants insisted on the required information, they would have determined that the guarantor's net income, which was primarily income from Borrower I, purportedly rose from $7,800 per month in 2005 to $48,000 per month in 2006.  On an annualized basis, the guarantor's income for all of 2006 would have increased to

$567,000.  Approving Defendants ignored the Credit Policy when they failed to determine whether or why the guarantor's income rose astronomically from 2005 to 2006 and failed to request current financials.

106.    Approving Defendants approved the loan despite inadequate financial information regarding the guarantor.  The guarantor provided financial statements that were not prepared by an accountant.  He claimed that his assets consisted mostly of real estate, an oil investment, a loan to Borrower I, and ownership in various LLCs.  There is no indication that these non-liquid assets were valued correctly or even existed.  Approving Defendants also failed to resolve significant discrepancies as to the source of the guarantor's down payment, even though it appeared that the funds may have been borrowed.

107.    In October 2008, the Bank received additional financial information from the guarantor, who had failed to obtain a long-term mortgage for the property.  As of the tenth month of 2008, the guarantor's 2008 year-to-date net income was $4,906.  Moreover, the guarantor's signed 2008 loan application entirely omitted the oil investment and LLCs that he had listed as assets on his 2007 loan application.

108.    The buyer of the home, who was also the guarantor, failed to obtain a long-term mortgage and purchase the house, and Borrower I defaulted on the loan.  By this time, Borrower I's income was negative.  The sale of the house and the assets of the borrower and guarantor were insufficient to repay the loan.

109.    As a result of the grossly negligent actions and inactions of Defendants Grant, Thomson, and Jones in approving the Borrower I loan, Centennial incurred damages in excess of $1,644,000.

**Borrower J**

110.    On or about May 7, 2007, the IHLC, including Williams and Grant, approved a $935,000 brokered stated income construction loan to Borrower J.  The loan was requested for the purchase of a lot and the construction of a new residence for the borrower, who claimed that the house was to be his primary residence.

111.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants had also received warnings that brokered loans, such as the loan to Borrower J, represented a significant known risk to the Bank because of the prevalence of mortgage fraud in connection with brokered loans.

112.    Although the borrower provided a non-binding commitment from a lender for a long-term mortgage for the home once the construction was finished, the Bank's Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required "that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

113.    The loan presentation information about Borrower J's income and employment suggested that he misrepresented  his "stated income."  Borrower J claimed to have earn an income of $330,000 per year (or $27,500 per month), but had monthly obligations of $3,000. The loan presentation's only statement regarding his occupation was that he "owns several companies and each appear to be profitable."  In violation of the Credit Policy, there was no information in the loan presentation about the type of companies he owned, whether the stated

income was reasonable given his field, or his occupation or field of expertise.  The Credit Policy required the evaluation of "the applicant's time on a specific job or length of time in a particular field" and a review of "available sources to compare 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."

114.    Had Approving Defendants obtained the required additional information about Borrower J, they would have determined that, as shown on his loan application, he had recently sold one house and owned another house and another lot.  This indicated a need to determine whether he was a spec borrower who was speculating in real estate, not constructing his primary residence.  If so, he would not have qualified for the loan requested from the Bank.

115.    In August 2008, the Bank received financial information for the borrower that showed he had a debt-to-income ratio of 95 percent, owned nine other properties, and was responsible for monthly payments of over $33,000.  The borrower's 2007 income was $168,000, which was half of the amount reported on his 2007 stated income loan application.

116.    The borrower failed to obtain a long-term mortgage and defaulted on the loan. The sale of the house and the assets of the borrower were insufficient to repay the loan.

117.    As a result of the grossly negligent actions and inactions of Defendants Williams and Grant in approving the Borrower J loan, Centennial incurred damages in excess of $342,000.

### Borrowers K and L

118.    On or about May 17, 2007, the IHLC, including Williams and Gnehm, approved a $600,000 brokered stated income construction loan to Borrowers K and L, a married couple. The loan was requested for the purchase of a lot and the construction of a new residence for the borrowers, who claimed that the house was to be their primary residence.

119.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants had also received warnings that brokered loans, such as the loan to Borrowers K and L, represented a significant known risk to the Bank because of the prevalence of mortgage fraud in connection with brokered loans.

120.    The borrowers provided a non-binding commitment from a lender for a long-term mortgage for the home once the construction was finished.  However, the Bank's Credit Policy prohibited "sole reliance on an end-loan commitment as a source of construction loan repayment."  Instead, the Credit Policy required "that the real estate and the project must be considered on their own merits, as if there were no take-out and the bank intends for the loan to become a permanent addition to its loan portfolio."

121.    The loan presentation stated that Borrower K was a community college teacher with income of $130,000 per year.  The loan presentation did not show verification of this income although the stated amount is questionable for a community college teacher.  The lack of verification violated the Bank's Credit Policy, which required for all "stated income" loan applications evaluation of "the applicant's time on a specific job or length of time in a particular field" and review of "available sources to compare 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."

122.    In 2008, the Bank received Borrower K's financial information in connection with a proposed long-term loan.  Contrary to Borrower K's $130,000 "stated income" on his 2007 loan application, tax documents showed that the borrowers' 2007 federal adjusted gross income was $57,450, and pay stubs showed that his 2008 salary was $77,000.

38

123.    The borrowers failed to obtain a long-term mortgage and defaulted on the loan. The sale of the house and the assets of the borrowers were insufficient to repay the loan.

124.    As a result of the grossly negligent actions and inactions of Defendants Williams and Gnehm, in approving the Borrower K and L loan, Centennial incurred damages in excess of $310,000.

**Borrower M**

125.    On or about June 7, 2007, the BLC, including Williams, Grant, Thomson, and Wall, approved a $1,350,000 A&D loan to Borrower M, and accepted the personal guarantees of the owners of Borrower M.  The loan was requested for the purchase of land and development of 24 residential lots.

126.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower M loan.

127.    The loan presentation contains a facially obvious critical error.  According to the presentation, Borrower M's 2005 net income was $748,720, its 2006 net income was $257,008, and its year-to-date net income as of June 2007 was $1,206,000 (suggesting an annualized net income of approximately $2,400,000).  However, the loan presentation listed Borrower M's 2007 net worth as the exact same amount as its 2007 net income—$1,206,000.  This identical number for both net income and net worth was not credible and should have caused Approving Defendants to exercise additional diligence as to the company's financial information.

128.     Had Approving Defendants examined or asked someone else to examine the financial information, it would have revealed the loan presentation's net income numbers were actually Borrower M's gross sales as listed on its tax returns.  The net income on its tax returns was a negative $4,480 for 2005 and $7,927 for 2006.  Failing to exercise the diligence required under the Credit Policy, Approving Defendants recklessly approved a loan based upon the company's gross sales, rather than net profit.  Approving a loan to a developer who had almost no income for the last two years violated the Credit Policy, which required Approving Defendants to consider the developer's income before approving development loans.

129.     The loan presentation contained other discrepancies as well.  As noted, the borrower's income as shown (erroneously) on the presentation went from $257,008 in 2006 to $1,206,005 in just the first six months of 2007, suggesting that the borrower had an annual income of approximately $2,400,000.  The purported jump in the borrower's income by a factor of ten from one year to the next was unexplained and should have caused Approving Defendants to scrutinize the financial information.  Similarly, the loan presentation showed that the income of one guarantor increased from $368 a month in 2005 to $13,319 a month in 2006.  This significant increase in income warranted further diligence to comply with the Credit Policy, because it showed that one of the guarantor owners of the borrower company, which ostensibly made $748,720 in 2005, had personal income of $368 a month in the same year.  The loan presentation omitted completely the 2007 year-to-date income information of the guarantors. Approving Defendants failed to conduct the required diligence.

130.     If Approving Defendants had conducted further diligence, they would have learned that, in addition to nonexistent income, the borrower had insufficient liquid assets for the

required cash equity.  The borrower was supposed to contribute approximately $300,000 of its own funds as cash equity in the project, but neither the borrower nor the guarantors had sufficient liquid assets to provide the required cash equity.

131.    The borrower defaulted on the loan in February 2008.  At that time, 90 percent of the loan had been disbursed, but only 75 percent of the construction was completed.

132.    The lots failed to sell and the value of the lots and the assets of the borrower and guarantors were insufficient to repay the loan.

133.    As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Wall in approving the Borrower M loan, Centennial incurred damages in excess of $1,095,000.

**Borrowers N and O**

134.    On or about July 6, 2007, the IHLC, including Gnehm, Grant, and Thomson, approved a $1,031,000 A&D loan to Borrowers N and O.  The loan was requested for the purchase of land and development of 19 residential lots.

135.    Prior to approving this Loan Transaction, Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower N and O loan.

136.    The loan presentation showed that the borrowers' income rose from $80,762 in 2005 to $277,439 in 2006, but lacked the required information regarding the borrower's year-to-date income.  Had Approving Defendants further investigated or required someone else to further investigate the borrowers' recent income, they would have determined that the 2006 income was

41

based on 2006 tax returns that showed a one-time capital gain of $218,468 from assets sold during that year.  Additionally, a financial disclosure worksheet shows that the borrower's land development company had four real estate projects with total monthly payments of $19,000, over $3.5 million owed to other lenders, and two other projects that relied on interest reserves.  These factor raise additional concerns under the Credit Policy that Approving Defendants ignored.

137.    The loan presentation also contained insufficient information regarding the borrowers' assets.  Although both borrowers each listed over $1,000,000 in assets, this was mostly in real estate and the value of their land development company.  Approving Defendants failed to determine if these illiquid assets were valued correctly, as required by the Credit Policy.  And, in any event, these assets were illiquid.

138.    In accordance with the approved loan, the borrowers were supposed to contribute $85,000 in cash equity, which also violated the Credit Policy's requirement that a minimum 10 percent cash equity investment had to be made by the borrowers.

139.    The borrowers defaulted and the lots failed to sell.  The value of the lots and the assets of the borrowers were insufficient to repay the loan.

140.    As a result of the grossly negligent actions and inactions of Defendants Gnehm, Grant, and Thomson in approving the Borrower N and O loan, Centennial incurred damages in excess of $689,000.

**Borrower P**

141.    On or about August 2, 2007, the IHLC, including Grant and Thomson, approved a $920,000 stated income construction loan to Borrower P.  The loan was requested for the

purchase of a lot and the construction of a new residence for the borrower, who claimed that the house was going to be his primary residence.

142.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower P loan.

143.     The loan presentation information about Borrower P's income and employment suggested that he misrepresented  his "stated income."  The loan presentation stated that the borrower was Vice President of a company with a salary of $300,000 per year in a position the borrower had held for only three years.  The loan presentation also disclosed that borrower had monthly obligations of $1,000, assets of $83,920 and a net worth of negative $220,717.  Under Credit Policy guidelines, the borrower's low net worth made his purported $300,000 per year income and low rent and expenses highly suspect, especially in connection with his application for a $920,000 loan.

144.     The loan presentation omitted information about the borrower's age of 28 years.  That fact would have raised further suspicions about the borrower's stated income.  The loan presentation also contained no analysis of whether the borrower's stated income was reasonable, in violation of the Credit Policy which required evaluation of "the applicant's time on a specific job or length of time in a particular field," and review of "available sources to compare the 'stated income' with salary or wage surveys for that position, years of experience, and the statistical area."

145.    Had Approving Defendants further investigated the financial situation of Borrower P, they would have determined that his stated income and assets were highly questionable.  In March 2007, another bank provided a verification of deposit that showed that although Borrower P had an account balance of $82,920 at that time, his average balance for the last two months had been significantly lower, $7,425.  The loan file contained no explanation as to why or how his bank account suddenly rose from an average of $7,425 to $83,000 in March 2007.  Furthermore, an average account balance of $7,425 is incongruous for a person who purportedly made $25,000 per month and had obligations of only $1,000 per month.  Based on the Credit Policy, such suspicious information should have caused Approving Defendants to obtain verification of income and documentation of the source of the March 2007 funds.  Instead, Approving Defendants approved the loan and allowed a 90 percent LTV ratio for the lot advance, even though the Credit Policy required a maximum lot advance LTV of 80%.

146.    In a September 2008 application for a loan modification, Borrower P revealed that he had been speculating in real estate.  His total assets were purportedly $6,110,000, his total liabilities were $4,337,189, and his credit report showed he owed a balance of over $3 million on real estate loans.  The loan presentation for the modification listed the borrower's year-to-date income (as of September 2008) as $60,250, and his gross monthly income also as $60,250, with no explanation.  The presentation stated, "Alan [Thomson] to write justification for no updated financials on presentation," but there was no such written justification.

147.    The borrower defaulted on the loan.  The sale of the house and the assets of the borrower were insufficient to repay the loan.

148.    As a result of the grossly negligent actions and inactions of Defendants Grant and Thomson in approving the Borrower P loan, Centennial incurred damages in excess of $632,000.

### Borrower Q

149.    On or about August 23, 2007, the BLC, including Williams, Grant, Thomson, and Jones, approved a $5,925,000 construction loan to Borrower Q, and accepted the personal guarantee of Borrower Q's owner.  Banker's Bank of the West purchased a participation in the amount of $2,925,000, and Centennial retained the remaining $3,000,000 of the loan.  The loan was requested for the purchase of land and construction of a 28-unit condominium project.

150.    Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower Q loan.

151.    Borrower Q was a single-purpose entity with no financial history, and the loan presentation showed that the guarantor had a low FICO score of 645.  Had Approving Defendants exercised further diligence, as the Credit Policy required, they would have determined that the guarantor's credit history included three serious delinquencies and a history of collections.  According to the loan presentation, the guarantor had assets of $32,434,583 and liabilities of $17,791,300.  Despite almost $18 million in liabilities, his monthly obligations were reported as $2,215.  Although the presentation disclosed that the guarantor was involved in three other projects of six to 13 homes each, it did not contain information required under the Credit Policy about his debt servicing requirements for those projects.  The value of the assets was not verified, and the guarantor had an annual net income of $237,697.

6433245_1

152.    The loan presentation also completely omitted information regarding the guarantor's net worth and income for 2004, 2005 and 2006.  Had Approving Defendants obtained this required information, they would have learned that guarantor's 2004 tax returns showed a gross income of only $37,281.  Prudent lending also required further diligence to determine if, how, and why the guarantor had an annual income of $37,281 one year, but had a purported net worth of over $14,000,000 just two years later.  With further diligence, they would also have learned that the guarantor had limited liquid assets of just $70,000.  Although his financial statement showed an "investment fund" of $2,022,000, it provided no additional information about the asset, such as information regarding ownership, liquidity, or source of the funds.  Moreover, the record shows that Approving Defendants failed to determine why, as of October 2007, the guarantor had not filed a 2006 tax return or what his 2006 tax return would disclose if he had timely filed one.

153.    The condominium units failed to sell and the borrower defaulted on the loan.  The sale of the condominium units and the assets of the borrower were insufficient to repay the loan.

154.    As a result of the grossly negligent actions and inactions of Defendants Williams, Grant, Thomson, and Jones in approving the Borrower Q loan, Centennial incurred damages in excess of $1,577,000.

**Borrower R**

155.    On or about February 8, 2008, the BLC, including Williams, Thomson, and Priest, approved a $2,057,000 commercial real estate loan to Borrower R, and accepted the personal guarantee of Borrower R's owner.  The loan was requested for the purchase and renovation of a commercial building.

156.     Prior to approving this Loan Transaction, the Approving Defendants had been warned about the need for increased underwriting scrutiny due to the Bank's high concentration in CRE loans.  Approving Defendants nonetheless failed to avail themselves of all material and reasonably available information related to the Borrower R loan.

157.     The Bank relied on a take-out loan from a long-term lender as a source of repayment, but, as was clear from the loan file, the lender would make the loan only if there was 90 percent occupancy and the ability to service the debt at a minimum of 1.20:1.  Approving Defendants failed to require the borrower to provide executed leases or lease proposals from tenants prior to their approval of the loan.  As a result, when they approved the loan, Approving Defendants had not determined whether the borrower even qualified for the take-out loan.

158.     It was clear from the loan presentation that the borrower and guarantor could not repay the loan without a long-term take-out loan.  Approving Defendants failed to take into account the borrower's and guarantor's lack of sufficient creditworthiness and inability to support the loan, including, but not limited to, their limited liquidity and income and their high leverage.  The guarantor had limited liquid assets of $222,936 spread out over seven different checking accounts under different corporate names.  Despite such limited liquid assets, the loan presentation made no analysis of the borrower's or guarantor's other real estate projects or their debt obligations for those projects, including a separate loan of almost $3 million from Centennial.  Furthermore, while the guarantor claimed a net worth of over $21 million, the entire amount was held in illiquid assets, such as real estate and LLCs.  Approving Defendants did not obtain verification of the value of borrower's and guarantor's assets, despite the loan presentation's disclosure that the guarantor had a low FICO score of 635.

47

159.    The borrower defaulted on the loan.  The sale of the property and the assets of the borrower and guarantor were insufficient to repay the loan.

160.    As a result of the grossly negligent actions and inactions of Defendants Williams, Thomson, and Priest in approving the Borrower R loan, Centennial incurred damages in excess of $653,000.

## FIRST CLAIM FOR RELIEF
### (Gross Negligence [Against All Defendants])

161.    The FDIC-R realleges and incorporates by reference the allegations contained in Paragraphs 1 through 159.

162.    Defendants Williams, Gnehm, Grant, Thomson, Jones, Priest, and Wall were officers and/or directors of Centennial.  Section 212(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") provides that such directors and officers of financial institutions may be held personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.  12 U.S.C. § 1821(k).

163.    The Defendants owed Centennial Bank a duty not to be grossly negligent in the performance of their duties as set forth in this Complaint, including, but not limited to: (a) conducting proper diligence on proposed loans and managing the risks these loans posed to the Bank before approving them; (b) complying with the Bank's Credit Policy; (c) complying with safe, sound, and prudent lending practices; (d) exercising sound judgment in connection with the review and approval or disapproval of CRE loans recommended by Centennial's loan officers; (e) ensuring that any loans they approved were secured by sufficiently valuable collateral, guarantees, and other necessary sources of repayment to prevent or minimize the risk of loss to the Bank; and (f) approving only safe, sound, and prudent loans in relation to the

48

Bank's capital and portfolio concentrations.  In addition, Defendants were warned by the Bank's

staff and by regulators that the risks from Bank's high concentration in CRE/ADC lending

created a duty to increase underwriting scrutiny on loans before Defendants approved the loans.

164.    The Defendants breached their duties and were grossly negligent by their acts and

omissions, as set forth in this Complaint, including:  (a) failing to conduct proper diligence on

the Loan Transactions and to manage appropriately the risks the Loan Transactions posed to the

Bank before approving them; (b) disregarding the Bank's Credit Policy and approving the Loan

Transactions that violated the Bank's Credit Policy; (c) failing to ensure that the Loan

Transactions were underwritten in a safe, sound and prudent manner prior to loan approval;

(d) failing to exercise sound judgment in connection with the review and approval or disapproval

of the Loan Transactions; (e) failing to ensure that the Loan Transactions were secured by

sufficiently valuable collateral, guarantees, and other necessary sources in order to prevent or

minimize the risk of loss to the Bank; (f) approving imprudent loans given the Bank's capital and

portfolio concentrations; and (g) ignoring regulatory warnings.

165.    Each Defendant knew or was grossly negligent for not knowing the risks

associated with the Loan Transactions, and was grossly negligent in approving the Loan

Transactions he or she approved, as set forth hereinabove.

166.    As a direct and proximate cause of the gross negligence of the Defendants, the

Bank suffered damages in excess of $11.2 million.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty—In the Alternative to First
### Claim for Relief [Against All Defendants])

167.    The FDIC-R realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 165.

168.    As officers and/or directors of Centennial, Defendants Williams, Gnehm, Grant,

Thomson, Jones, Priest, and Wall owed Centennial fiduciary duties not to be grossly negligent in

the performance of their responsibilities as set forth in this Complaint, including, but not limited

to:  (a) conducting proper diligence on proposed loans and managing the risks these loans posed

to the Bank before approving them; (b) complying with the Bank's Credit Policy; (c) complying

with safe, sound, and prudent lending practices; (d) exercising independent judgment in

connection with the review and approval or disapproval of CRE loans recommended by

Centennial's loan officers; (e) ensuring that any loans they approved were secured by sufficiently

valuable collateral, guarantees, and other necessary sources in order to prevent or minimize the

risk of loss to the Bank; and (f) approving only safe, sound, and prudent loans in relation to the

Bank's capital and portfolio concentrations.  In addition, Defendants were warned by the

regulators that the risks from Bank's extremely high concentration in CRE/ADC lending created

a duty to increase underwriting scrutiny on loans before Defendants approved the loans.

169.    In the alternative to Count I, Defendants breached their fiduciary duties by their

acts and omissions, as set forth in this Complaint, including:  (a) failing to conduct proper

diligence on the Loan Transactions and to manage appropriately the risks the Loan Transactions

posed to the Bank before approving them; (b) disregarding the Bank's Credit Policy and

approving the Loan Transactions that violated the Bank's Credit Policy; (c) failing to ensure that

6433245_1

the Loan Transactions were underwritten in a safe, sound, and prudent manner prior to loan

approval; (d) failing to exercise independent judgment in connection with the review and

approval or disapproval of the Loan Transactions; (e) failing to ensure that the Loan Transactions

were secured by sufficiently valuable collateral, guarantees, and other necessary sources in order

to prevent or minimize the risk of loss to the Bank; (f) approving imprudent loans given the

Bank's capital and portfolio concentrations; and (g) ignoring regulatory warnings.

170.     As a direct and proximate cause of Defendants' breaches of fiduciary duty, the

Bank suffered damages in excess of $11.2 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver for

Centennial Bank, demands a trial by jury and judgment in its favor against Defendants as

follows:

A.     For compensatory damages and other damages, jointly and severally, against

Defendants for their gross negligence and/or breaches of fiduciary duty that resulted in damages;

B.     For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l)

and Utah law; and

C.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

DATED this 27th day of September, 2013.


/s/Cecilia M. Romero
John P. Harrington (5242)
Cecilia M. Romero (9570)
HOLLAND & HART LLP

James B. Davidson (11985)
Lori Irish Bauman [*Pro Hac Vice* Admission to be Filed]
Heidee Stoller [*Pro Hac Vice* Admission to be Filed]
ATER WYNNE LLP

*Attorneys for Plaintiff*
*Federal Deposit Insurance Corporation as Receiver for*
*Centennial Bank*